Mariano S. FALCON, Plaintiff-Appellee Cross-Appellant,

v.

GENERAL TELEPHONE COMPANY OF the SOUTHWEST, Defendant-Appellant Cross-Appellee.

No. 78–3587.

United States Court of Appeals, Fifth Circuit.

Sept. 22, 1980.

Rehearing and Rehearing En Banc Denied Oct. 27, 1980.

E. Russell Nunnally, Dallas, Tex., Stephen W. Holt, San Angelo, Tex., for defendant-appellant cross-appellee.

John E. Collins, Irving, Tex., Frank P. Hernandez, Garland, Tex., for plaintiff-appellee cross-appellant.

Before TUTTLE, RANDALL and TATE, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal from a judgment for the plaintiffs in a class action Title VII employment discrimination suit. We affirm part

of the trial court's decision and remand the rest for further proceedings.

This class action, filed originally by Mariano S. Falcon, a Mexican-American, challenged the hiring and promotion practices of the defendant employer, General Telephone Company of the Southwest (General), on the ground that General impermissibly discriminated on the basis of national origin against Mexican-Americans (Spanish speaking Americans).[1] Falcon applied for a job with General in July of 1969. He was hired as part of an affirmative action program, and after a training period, he began work as a groundman. After one month, he was promoted to lineman and a short time later, he was promoted to lineman in charge. One year after he was hired, he turned down a promotion to installer-repairman, and he did not receive any other promotion prior to October, 1972, at which time he applied for a promotion to Field Inspector. He did not receive this promotion although several other non-Mexican-Americans with less seniority than Falcon received the promotion. Falcon then filed a complaint with the Equal Employment Opportunity Commission (EEOC) charging that General discriminated in the area of promotions.[2] He filed suit in early 1975, challenging both the hiring and promotion policies of General in a class action suit. The trial court certified the class, but limited the class to those Mexican-American employees who had applied for employment or were employed in General's Irving, Texas division.

At Phase I of the trial,[3] the district court decided that General had discriminated against the plaintiff with respect to promotion, but not with respect to hiring, and that General had discriminated against the other members of the class with respect to hiring, but not with respect to promotions. The court apparently based its finding of discriminatory hiring on statistics, introduced by the plaintiff, which indicated that Mexican-Americans represented 5.24% of the work force in the Dallas/Fort Worth area, the relevant area for Irving, while only 1.22% of General's employees in 1972 were Mexican-American. The trial court also relied on the fact that 20 Caucasians were hired in 1972, as opposed to no Mexican-Americans, and that in 1973, only 4% of

1. In this opinion, as in the court below and in the briefs, Mexican-Americans and Spanish speaking Americans are used interchangeably.

2. The factual portion of the EEOC charge stated:

"I believe that I have been discriminated because of my national origin—SSA. I have been passed up for promotion to inspector by whites with less seniority and less experience than I have. This is contrary to my union's seniority system as depicted by the Collective Bargaining Agreement. Also, I believe that the Company's promotion policy has operated against a class —SSA."

The attached affidavit of Falcon stated:

"I was hired by General Telephone in July, 1969, as a groundman. A month later I made lineman, and a month later lineman-in-charge. I have received no further advancement.

The normal progression of jobs from bottom to top is as follows: groundman, lineman, lineman-in-charge, inspector, crew foreman, and finally, construction foreman.

My present supervisor, Bill Hamrick (white), made lineman-in-charge the same time I did. He has since become a construction foreman.

Jerry Hoffman (white) was hired in the latter part of 1970 and was promoted from groundman to inspector within six months. Two months later he was made a crew foreman, and two months later a construction foreman.

Randy Railey (white) was hired in the latter part of 1970 and was made an inspector from lineman within a year. He is now an installer-repairman in Carrollton, Texas.

Jerry Eden (white) was hired in April of 1972 as a lineman. He had seven years experience as a contractor. He was given duties of inspector on September 18, 1972.

I believe that I have been discriminated against by my company's promotional policy because I am SSA. Witnesses who will attest to both my qualifications and the facts in this affidavit are: (1) Bob Ferguson; (2) John Chamberlain—Union Steward of my union, CWA—Communication Workers of America; (3) Rick Schaeffer; (4) Stanly Mann; (5) Mike Wilcox; (6) Willie Baxter; (7) Pete Butler . . . all whites.

Mr. Loy Goldston is my area supervisor and Mr. Rhett Mun is my district supervisor."

3. The different hearings will be discussed as Phase I, Phase II, etc. At Phase I, the trial court found liability and ordered injunctive relief. At Phase II, the trial court determined damages.

those hired were Mexican-American.[4] *See* note 16 *infra.*

With respect to hiring at Phase I, there was testimony that General had a policy of keeping all applications active for only three months. The court found that none of the applicants were informed of this time limit, that the applicants were not informed as to what positions were open, and that they were not informed as to the qualifications for any of these positions. Thus, General was given the burden of proving at Phase II that there had not been any job openings for which the class members had been qualified after the three month period.[5]

As stated previously, the trial court also decided that Falcon was discriminated against in promotions. The court based its decision there on its finding that General's proferred reasons for promoting the other men, rather than Falcon, were insufficient and subjective. Therefore in Phase I, as a preliminary part of its relief order, the court ordered the defendant to take numerous affirmative action steps and the judge held that the plaintiff and the class were entitled to attorney's fees.

At Phase II of the trial, the court ruled that General had not met its burden of proving that there had been no available openings for the class applicants who wished to be hired after the three month "active" application period. All 13 class members therefore received back pay awards and job security awards to compensate them for the fact that if they had been hired by General, they would have been in a union. The judge also awarded attorney's fees to the plaintiff and class.

Both sides appeal from this judgment. The appellant, General, bases its appeal on a number of issues. It argues that:

(a) The trial court erred in certifying the class;

(b) The trial court did not have jurisdiction over the discriminatory hiring claim since the EEOC charge related solely to a discriminatory promotion policy claim;

(c) The trial court erred in finding that the plaintiff below had been discriminated against with respect to promotion;

(d) The trial court erred in finding that the defendant below had discriminated against the class with respect to hiring;

(e) The trial court erred in admitting reports from the General Services Administration (GSA);

(f) The trial court erred in making back pay awards without sufficient evidence that job openings existed for which the class members were qualified;

(g) The trial court erred in finding the application procedure unreasonable;

(h) The trial court awarded too much in back pay;

(i) The trial court awarded too much in attorney's fees.

The appellee, Falcon, argues that:

In its brief in this Court, General also argues that both it and the plaintiffs' statistics show the following:
a) *July 1972–June 1976*: 7.73% of those hired at Irving were Mexican-Americans.
b) *1973–1976*: 18.3% of all Mexican-American applicants were hired, although only 2.98% of General's applicants were Mexican-Americans.
c) *1973–1976*: 5.66% of General's white applicants were hired, although 81.5% of the work force in the area was white and 86.65% of the applicants were white.
The trial court also found that General employed 526 people, but that only one of 66 management employees were Mexican-American. *See* note 16 *infra.*

---

4. General presented statistical evidence showing the following, in part:
a) The percentage of General's new hires at its Irving facility which were Mexican-Americans was:

| | |
|---|---|
| 1973 | 4.0% |
| 1974 | 13.2% |
| 1975 (through 7/30) | 18.8% |

b) In the available labor market in the Dallas/Ft. Worth area, the percentage of Spanish-surnamed Americans was 5.24%; in Irving it was 3.6%.
c) The percentage of Mexican-Americans and whites who were hired from the applicant pool for that group.

| | Whites | Mexican-Americans |
|---|---|---|
| 1973 | 10% | 17% |
| 1974 | 3.3% | 17% |
| 1975 | 0.7% | 10.3% |

5. The court based its burden of proof ruling on the fact that General's hiring policies exacerbated its discriminatory policies.

(a) The trial court erred in limiting the class to those employed in the Irving division;

(b) The trial court awarded too little in back pay.

We shall examine each of these issues in the approximate order they were raised at trial.

## I. Class Certification

The appellant argues that under Rule 23, the trial court erred in certifying the class at all. On his cross-appeal, Falcon claims that the only error involved in the certification was the trial judge's limiting of the class to Mexican-Americans who are employed at or have applied to the Irving division of General, rather than all of the divisions. We shall examine each of those issues in turn.

The appellant bases its argument on three theories. It says the claim of the class representative was not typical of the claims of the class; that the class representative could not fairly and adequately protect the interests of the class, and that the questions of law and fact raised by the claims of the class representative were not common to the questions of law and fact raised by the claims of the class. General also argues that the failure of the trial court to hold an evidentiary hearing on this matter may, in itself, require a reversal of certification.

### A. Failure to Hold a Hearing

General alleges that the failure to hold an evidentiary hearing on the issue of certification requires reversal of the certification, citing *Satterwhite v. City of Greenville*, 578 F.2d 987 (5th Cir. 1978) (en banc), *vac. and remanded*, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980). Falcon says, in opposition, that such a hearing was not necessary.

 We disagree with General's contention that the failure to hold such a hear-

ing, in itself, requires a reversal of certification. It is true that this Court has repeatedly stressed the importance and value of such an evidentiary hearing on the certification issue. *Satterwhite v. City of Greenville*, 578 F.2d 987, 998 (5th Cir. 1978) (en banc), *vac. and remanded on other grounds*, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980); *King v. Gulf Oil Co.*, 581 F.2d 1184, 1186–87 (5th Cir. 1978); *Huff v. N.D. Cass Co. of Alabama*, 485 F.2d 710 (5th Cir. 1973). But such a hearing is important only in the context of showing whether or not a class should have been certified. If later evidence shows the decision to certify to have been a correct one, there was obviously no need to have held such a hearing. *King* at 1186–87. To prevail solely on a contention that a hearing was required, an appellant must show that if a hearing had been held, it could have affected his rights substantially. That can only occur in a situation in which the district court made a decision to deny certification without a hearing, since it is only in that case that a party can show that there was a substantial issue as to certification and that he was denied an effective opportunity to litigate it. We therefore hold that the mere fact that a class has been certified without a hearing is not a ground for reversal of that decision. Even when no hearing is held before certification is granted, a party has an adequate opportunity later to argue the substantive merits of the decision to certify. We therefore turn to the merits of General's arguments concerning certification.

### B. Appellant's Substantive Class Certification

Although the appellant argues that the class did not meet three of the requirements of Rule 23(a)[6], most of these claims are based on the appellant's contention that Falcon, who was complaining of discrimina-

---

6. Rule 23(a) states:

*Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are ques-

tions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

tion with respect to promotion, could not represent a class complaining of discrimination with respect to hiring. General maintains that according to *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), Falcon cannot represent both hiring and promotional discriminatees because he has not established a sufficient nexus between his claims of promotional discrimination and the other class members' claims of hiring discrimination. *See also Scott v. University of Delaware*, 601 F.2d 76 (3rd Cir.), *cert. denied* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979); *Hill v. Western Electric Co., Inc.*, 596 F.2d 99 (4th Cir.), *cert. denied* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979).

In contrast, Falcon argues that this Court has not interpreted the nexus requirement of *East Texas Motor Freight* as restrictively as other courts and that, therefore, this action was properly certified under this Court's standards. *See Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895 (5th Cir.), *cert. denied* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978); *Vuyanich v. Republic National Bank of Dallas*, 82 F.R.D. 420 (N.D.Tex.1979); *Satterwhite v. City of Greenville*, 578 F.2d 987 (5th Cir. 1978) (en banc), *vac. and remanded* 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980). Falcon's position is essentially that this Court still permits "across the board" attacks on discrimination.

■ We agree. In *Payne v. Travenol Laboratories, Inc.*; *supra*, this Court said:

Plaintiffs' action is an "across the board" attack on unequal employment practices alleged to have been committed by Travenol pursuant to a policy of racial discrimination. As parties who have allegedly been aggrieved by some of these discriminatory practices, plaintiffs have demonstrated a sufficient nexus to enable them to represent other class members suffering from different practices motivated by the same policies. (Citations omitted) [7]

It is therefore apparent that this Court permits an employee complaining of one employment practice to represent another complaining of another practice, if the plaintiff and the members of the class suffer from essentially the same injury. In this case, all of the claims are based on discrimination because of national origin. It is consistent with the holding in *Rodriguez* and the policy of Title VII to allow a plaintiff to represent a class suffering from a common discriminatory complaint. While similarities of sex, race or national origin claims are not dispositive in favor of finding that the prerequisites of Rule 23 have been met, they are an extremely important factor in the determination, that can outweigh the fact that the members of the plaintiff class may be complaining about somewhat different specific discriminatory practices. *See also Quigley v. Braniff Airways, Inc.*, 85 F.R.D. 74, 78–79 (N.D.Tex. 1979); *Cooper v. University of Texas at Dallas*, 482 F.Supp. 187, 192 (N.D.Tex.1979). In addition here, the plaintiff showed more than an alliance based simply on the same type of discriminatory claim. He also

---

7. *See also Satterwhite v. City of Greenville*, 578 F.2d 987, 993–994 n.8 (5th Cir. 1978) (en banc), *vac. and remanded*, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980) in which this Court said:

. . . Nor is Rodriguez or this opinion contrary to the policy favoring "across the board" Title VII class actions. *See Johnson v. Georgia Highway Express* [417 F.2d 1122 (5th Cir.)], *supra*. It is not necessary that the representative suffer discrimination in the same way as other class members, but it is necessary that she suffer from the discrimination in some respects.

As noted, *Satterwhite* was subsequently vacated and remanded by the Supreme Court. In

*Satterwhite*, a job bias claimant, an applicant for city employment, had been denied the right to represent a class of present and future city employees because she was not a member of the proposed class. The Supreme Court remanded the case for reconsideration in the light of two recent cases, *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) and *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), which broadened the possible use of class actions when the named plaintiff's claim had become moot. Therefore, it seems that the Supreme Court's remand did nothing to question the rule in this Court that "across the board" actions can still be brought.

showed a similarity of interests based on job location, job function and other considerations. *Cf. Crawford v. Western Electric Co., Inc.,* 614 F.2d 1300, 1304 (5th Cir. 1980).

Given our finding of a sufficient nexus between the plaintiffs' claims and those of the class, we find that the requirements of Rule 23 were satisfied.[8] *See* note 6. We therefore hold that the trial court acted correctly when it certified Falcon's claim on behalf of these other plaintiffs.[9]

### C. *Appellee's Class Certification Claim*

On cross-appeal, the appellee contends that the trial court erred in refusing to extend the class to all Mexican-American employees who were employed by or had applied to any of General's divisions, not just the one at Irving. He contends that since he worked in all of the towns in the Fort Worth, Texas area, and not only in the Irving division, he can properly represent the larger unit.

We find that the district court acted within its discretion in limiting the class to the Irving location, especially since the various General divisions each conduct their own hiring. In addition, management of such a large class would be much more difficult. *Cf. Hill v. American Airlines, Inc.,* 479 F.2d 1057 (5th Cir. 1973).

### II. *Jurisdiction to Hear the Claim*

The appellant argues here that the trial court did not have jurisdiction over the claim of hiring discrimination because the EEOC charge referred only to discrimination with respect to promotion. Relying on the opinions in *United Airlines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) and *McArthur v. Southern Airways, Inc.,* 569 F.2d 276 (5th Cir. 1978), General maintains that this Court's holding in *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir. 1970), that a court could take jurisdiction of claims which are "reasonably" related to the EEOC charge, must be reexamined. The Company also argues that the EEOC investigation and determination concerning hiring were beyond its jurisdiction.

In *Sanchez,* this Court said:

[T]he civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation. Within this statutory scheme, it is only logical to limit the permissible scope of the civil action to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

431 F.2d at 466. Thus in *Sanchez,* this Court endorsed a liberal standard for requirements relating to the relationship between the charge, the investigation, and a civil suit.

The two cases cited by the appellant do not question this standard. In *United Airlines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the Supreme Court held that a stewardess who had failed to complain of her discriminatory discharge was barred from later contending that she

---

8. On the adequacy of representation issue, General also argues that there was no evidence to show the qualifications of the attorneys who represented the class. While it is true that the requirement of adequate representation includes the competence of the legal counsel of the representatives, *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir. 1969), the competency of counsel can be judicially noticed, as was apparently done in this case. In any event, we do not overturn the trial court's decision on this matter, since it was not an abuse of discretion. *Guerine v. J&W Ins., Inc.,* 544 F.2d 863 (5th Cir. 1977); *Boggs v. Alto Trailer Sales, Inc.,* 511 F.2d 114 (5th Cir. 1975).

9. For a similar analysis of *Rodriguez* and *Satterwhite, see Vuyanich v. Republic National Bank of Dallas,* 82 F.R.D. 420, 432–33 (N.D. Tex.1979).

With our holding we do not intimate any conflict with the logic of *Crawford v. Western Electric Co., Inc.,* 614 F.2d 1300, 1304 (5th Cir. 1980) where the court said that "[t]he fact that plaintiffs are members of the same race as the other employees and rejected job applicants whom they seek to represent in a class action is not enough in itself to require a finding under Rule 23 that their representation was adequate or that their claims were typical of the class." Such a fact by itself, of course, is not enough to meet the requirements of Rule 23.

was discriminated against after being re-hired based on the employer's failure to include her prior employment in determining her seniority. The court held that she was time-barred from complaining of the prior illegal discharge because she had not complained at the proper time. In *McArthur v. Southern Airways, Inc.*, 569 F.2d 276 (5th Cir. 1978), this Court followed *Evans* by dismissing as time-barred a cause of action somewhat similar to the one in *Evans*. We find it difficult to see the relevance of these decisions to the issue here.

The question we face is whether an EEOC complaint of promotion discrimination is sufficiently related to a hiring discrimination claim to allow the EEOC to investigate both and therefore authorize a suit based on both charges. In *Gamble v. Birmingham So. Railroad Co.*, 514 F.2d 678 (5th Cir. 1975), this Court defined the "reasonable expectation" test of *Sanchez* again as hinging on whether the broader EEOC investigation might be expected to grow from the original complaint. *Id.* at 688.

Some courts have interpreted the standard of *Sanchez* to mean that any practice which is an outgrowth of the same basis of discrimination can be challenged in the court suit. *See Graniteville Co. v. EEOC*, 438 F.2d 32, 41–42 (4th Cir. 1971) (discrimination in promotion related to discrimination in hiring); *McBride v. Delta Airlines*, 551 F.2d 113, 115 (6th Cir.), *vacated on other grounds* 434 U.S. 916, 98 S.Ct. 387, 54 L.Ed.2d 273 (1977) (individual firing charge requires review of any racially discriminatory practices because of large and complex corporate structure). *Cf. Arey v. Providence Hospital*, 55 F.R.D. 62, 67 (D.D.C. 1972) ("[i]t seems clear that once having received the complaint of discrimination against complainant the EEOC would as a reasonable matter, extend their investigations to all areas of employment in which the complainant at one time or another had been exposed, including, of course, the facts and circumstances surrounding the initiation of her employment.") This Court in *EEOC v. Huttig Sash & Door Co.*, 511 F.2d 453 (5th Cir. 1975) held that a charge of discrimination in termination will support

another claim of discrimination in hiring. Other courts have held that the fact that EEOC ended up investigating a broader charge than the one alleged is a strong reason to allow the issue to be raised in a court suit. *Henderson v. First National Bank of Montgomery*, 344 F.Supp. 1373 (M.D.Ala.1972); *Cf. Oubichon v. North American Rockwell Corporation*, 482 F.2d 569 (9th Cir. 1973); Note, Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1216–18 (1971).

■ We find that the district court had jurisdiction over both the hiring and promotion claims under the *Sanchez* standard. This Court's traditional application of a liberal standard in this area is a reflection of our understanding about the realities of Title VII litigation. Often the complainants are poor and uneducated. They are unfamiliar with legal concepts and often do not comprehend the specific elements of their complaint. But they understand the basic premise of the Act. They feel that they have been discriminated against on the basis of race or some other impermissible factor. To hold these individuals to a high standard of knowledge about the bases of their charge would ill-serve the remedial purpose of Title VII. In this case, it is sufficient that Falcon alleged the type of discrimination ("national origin"), especially since an investigation of promotional practices almost inevitably leads to a study of hiring practices, and the EEOC did investigate both areas. *EEOC v. Huttig Sash & Door Co.*, 511 F.2d (5th Cir. 1975).

### III. *Promotion Claims*

In this part of the appeal, General argues that Falcon never proved he was qualified for the promotion he sought. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). General also says that it articulated valid, nondiscriminatory reasons for not promoting Falcon, namely that those persons who were promoted were more qualified than Falcon, and that Falcon failed to prove that those

reasons were merely pretexts for discrimination. *See Board of Trustees v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

In rebuttal, Falcon suggests that the Supreme Court's use of the word "articulate" in *Sweeney, supra,* was not intended to cover subjective criteria, but requires "something rationally based."

■ In "disparate treatment" cases, the plaintiff has the burden of establishing a prima facie case. That can be done by the plaintiff by showing

 (i) That he belongs to a [protected] minority [under the Act];

 (ii) That he applied and was qualified for a job for which the employer was seeking applicants;

 (iii) That, despite his qualifications, he was rejected; and

 (iv) That, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Looking at these requirements, we find that clearly Falcon belonged to a protected minority under the Act; that he applied for a job for which the employer was seeking applicants; that he was rejected, and that the employer hired others for the position. The only element of the prima facie case which the appellant attacks here is whether or not Falcon had the qualifications for the position he was seeking.

■ According to General, Falcon was recommended for promotion to a management position by two of his first level supervisors. At General, once a supervisor recommends an employee for a promotion to a management position, that employee is considered for all management positions for which he is considered qualified by reason of prior experience. General says that Falcon was "not considered *the most qualified* person for any of the openings." (Emphasis added.) That claim, however, even if true, does not mean that Falcon was not considered qualified. The fact that Falcon was recommended for promotion to management lends additional support to his contention that he was qualified for those positions. We therefore uphold the trial court's apparent finding that he was qualified and therefore find he made a valid prima facie case.

■ Falcon's having made that prima facie showing, General has the obligation to "articulate some legitimate, nondiscriminatory reason" for the action to dispel the adverse inference from the prima facie showing. *McDonnell Douglas* at 802, 93 S.Ct. at 1824. As stated in *East v. Romine, Inc.,* 518 F.2d 332 (5th Cir. 1975), the defendant must also prove that those hired or promoted were better qualified than the plaintiff. *See Burdine v. Texas Dept. of Community Affairs,* 608 F.2d 563, 567 (5th Cir. 1979), *cert. granted* —— U.S. ——, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980).

In fact, General did put forth the explanation that the people hired for the positions Falcon wanted were more qualified than he was.[10] Through statistical evidence, the Company also showed that Falcon had received three promotions in seven years of employment with General, an average of 0.43 promotions a year, while the

---

**10.** The Company also attempted to prove at trial through the use of statistical evidence that Mexican-Americans, in general, were not adversely affected by General's promotion procedures. The trial court agreed with this second contention.

 As to the specific openings about which Falcon complains, the Company says that one individual who was promoted to crew foreman had special training in electronics, went to college, and worked in the electronics field in the military. Another individual, promoted to inspector, had been a foreman with a contractor, and had performed essentially the same duties there, as he would in the job to which he was promoted. A third individual, promoted to crew foreman, the Company says, had held supervisory positions in the military.

 The Company says that in the opinion of the second level supervisor, each of the men selected was more qualified than Falcon, who they say had no prior experience in either electronics or the communications industry and had performed unsatisfactorily in supervisory roles.

average white worker at General received only .20 promotions per year. In addition, General said that Falcon received his first promotion only one month after being employed; the average white employee did not receive a promotion until he or she had been employed 14.91 months.

However, the trial court found that the ratings given Falcon and the others who had been promoted instead of him were "very similar" (all were favorable). Falcon, the trial court found, had no listed weaknesses except for "underground cable work." Since the trial court concluded that General had discriminated against Falcon, it must have reasoned that since Falcon had essentially the same overall ratings as those whites who were promoted, the Company's explanation that the others were "more qualified" was simply a pretext for discrimination and was not a legitimate reason for failing to promote him.[11] *Cf. Burdine v. Texas Dept. of Community Affairs*, 608 F.2d 563, 567, especially n. 8 (5th Cir. 1979), *cert. granted* —— U.S. ——, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980).

■ Our task here then is to decide if the trial court was clearly erroneous when it concluded that Falcon was as qualified as the other people who were promoted. We conclude that the finding was not clearly erroneous.

As stated previously, General said that it felt Falcon was not the most qualified applicant for any of the openings. But there was credible evidence to the contrary. The EEOC investigator who looked into the case, Robert Ray, testified that he felt Falcon was not promoted because he was a Mexican-American. His notes made at that time, indicated that several people who worked with Falcon and with some of the others who were promoted, felt Falcon was at least as qualified as those promoted, and was not promoted because of his national origin. Ray also prepared a chart comparing, as objectively as possible, Falcon's qualifications and experience with that of the other people promoted.[12] What he found was that Falcon was better qualified than one of the people promoted above him, as qualified as another, and less qualified than the third.[13] Similar findings by EEOC investigators in other cases have been described as "highly probative" by this Court. *Peters v. Jefferson Chemical Company*, 516 F.2d 447, 450 (5th Cir. 1975); *Smith v. Universal Services, Inc.*, 454 F.2d 154 (5th Cir. 1972). Despite testimony from others that they considered Falcon less qualified than those hired, the trial court could certainly find that given the EEOC investigator's and Falcon's testimony, Falcon was as qualified as the other people promoted.[14]

We also note that this Court has stated previously that while qualifications are obviously an employer's prerogative, "the standards cannot be automatically applied to freeze out" minorities. *Rowe v. General Motors Corporation*, 457 F.2d 348, 358 (5th Cir. 1972). In *Rowe*, this Court recognized

---

11. The trial court also said that the criteria used to rate and to promote were subjective. The trial court reached this decision based on the company promotion procedure. According to the trial court:

 "Hourly workers who wish a promotion bid for the job. When a vacancy occurs in a salaried management position, there is no formal posting procedure for hourly employees to be made aware of the vacancies. First line supervisors of hourly employees may make recommendations for promotions. These recommendations go to second line supervisors and the area personnel officer. . . ."

12. Working with the entire employee file provided by General Telephone, Ray evaluated these employees' qualifications by looking at the date hired, previous experience, the last evaluation before they were promoted out of the lineman position, the date they were promoted from lineman in charge, the time between the last evaluation and the promotion, and the objective rating on their evaluation.

13. Hoffman scored a 32, Hamrick a 31, and Raley a 28. Falcon scored a 31 also. *See* note 2.

14. On General's behalf on this specific point, Jake Goldston, who was Falcon's second line superior, testified about several disciplinary actions taken against Falcon, and said he considered the others promoted to be more qualified than Falcon. Harvey Sumner, a construction foreman who supervised Falcon, testified that he once demoted Falcon because he was less efficient than other employees.

that "promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination. . . ." *Id.* at 359. While obviously not determinative in this case since a variety of other factors were considered in the promotion decision, we note that a principal element in that decision were the recommendations of Falcon's supervisors, all of whom were white. Given this Court's pronouncement in *Rowe*, the trial court could certainly look at the Company's explanations that Falcon was less qualified with some skepticism. *Cf. Fisher v. Proctor & Gamble Mfg. Co.*, 613 F.2d 527, 546 (5th Cir. 1980).

We therefore find that the trial court did not act incorrectly when it found that the Company's explanation that Falcon was less qualified than the others promoted was not legitimate or, as the court has put it, "pretextual."

IV. *Hiring Claims*

In this portion of the appeal, General argues that there was insufficient evidence to support the trial court's conclusions that General discriminated against the class members with respect to hiring. General questions both the factual sufficiency of the evidence, as well as the trial court's reliance on some statistics, as opposed to others.

In its Phase I order, the court focused on four statistical "facts:"

(1) 5.24% of the Dallas/Forth Worth labor force was Mexican-American;

(2) 1.22% of General's work force at Irving was Mexican-American in 1972;

(3) Twenty people were hired in 1972, but none of them was Mexican-American;

(4) Only 4% of those hired in 1973 were Mexican-American.

General claims that the district court improperly relied on the statistical disparity between the local labor force and the work force at the Irving facility, rather than relying on the plant hiring statistics for the years between 1972 and 1976. General con-

tends that there is statistical evidence showing that:

(1) Mexican-Americans constituted 7.73% of the persons hired at the Irving facility from July 1972–July 1976, whereas only 5.24% of the local labor market was Spanish-American;

(2) From 1973 through 1976, 71 Mexican-Americans applied for jobs at the Irving facility and 13 were hired, an 18.3% percentage. During this time, only 5.66% of the Caucasian applicants were hired, although 81.5% of the local work force was Caucasian, as were 86.5% of the applicants.

*See* note 4.

Proof in this sort of class action case is usually dependent upon statistical comparisons. In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court found that a prima facie case of discrimination could be found by showing great disparities in general population/work force statistics.[15] In *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the Supreme Court found that this same showing of disparity, along with instances of individual discrimination, established a prima facie case. However, there, the Court ruled that this prima facie showing could be rebutted with favorable evidence comparing the qualified labor market with the defendant's hiring policies during the relevant period.

This Court recently said in *United States v. City of Alexandria*, 614 F.2d 1358, 1364 (5th Cir. 1980):

To make out a prima facie case of pattern or practice of discrimination in violation of Title VII, all that a private or government plaintiff need show initially is that there is a significant statistical disparity between the racial, sexual, or ethnic balance and composition of an employer's work force and that of the community from which the workers are hired. . . . This is true because, "absent

15. In *Teamsters*, the plaintiff also presented many examples of individual discrimination.

explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired." *Teamsters, supra,* 97 S.Ct. at 1856 n. 20.

Once this prima facie case has been established, the employer may introduce evidence to attempt to rebut the inference raised by the figures. . . . (Citations omitted.)

We take this to mean that once the plaintiff has offered some evidence that is probative of disparity that may be statutorily significant, it is then the defendant's burden to come up with more specific statistical evidence to rebut the plaintiff's proof.

In this case, the trial court found that in 1972, the Irving Division hired 20 Caucasians, but no Mexican-Americans, and that in 1973, the total number of Caucasians hired at Irving was 155 or 76.7%, and the number of Mexican-Americans hired was eight or 4%. However, the trial court made no findings about hiring in 1974 or 1975, even though both sides presented statistical evidence, at least through the period of July 30, 1975.[16]

Evidently, the trial court relied on the plaintiff's evidence for its hiring findings concerning 1972 and the defendant for its findings concerning 1973. *See* note 16. However, the trial court made no findings of fact concerning 1974 or 1975. It appears that the trial court must have found discrimination for those periods since the class action notice approved by the court was addressed to "all Mexican-Americans who applied for work at General Telephone Co. in Irving, Texas, in 1972, 1973, 1974, 1975, and through October 18, 1976." [17] This conclusion is bolstered by the fact that some members of the class who received relief applied for jobs in late 1975 or early 1976.

It would clearly be inappropriate for us to rule on the appellant's claim concerning the use of these hiring statistics, as opposed to applicant flow data, without knowing how or why the trial court relied on the statistical evidence it did and why it found hiring discrimination for the years 1974 and 1975. In *Hazelwood,* the Supreme

---

16. The statistical evidence proffered by the plaintiffs for hiring in the Irving Division showed:

| Year | White | Black | Mexican-American |
|---|---|---|---|
| 1972 | 19 | 1 | 0 |
| 1973 | 59 | 6 | 4 |
| 1974 | 26 | 6 | 6 |
| 1975 | 27 | 1 | 3 |
| 1976 | 8 | 0 | 0 |
| | 139 | 14 | 13 |
| | (82.7%) | (8.31%) | (7.73%) |

The evidence proffered by General, for hiring in the Irving Division showed:

| Year | White | Black | Spanish-Speaking | Other |
|---|---|---|---|---|
| 1973 | 155 | 37 | 8 | 2 |
| 1974 | 53 | 6 | 9 | 0 |
| 1975 (thru 7/30) | 4 | 9 | 3 | 0 |
| | 212 | 52 | 20 | 2 |
| | (74.12%) | (15.18%) | (6.99%) | (.01%) |

The plaintiff also introduced the following evidence comparing the percentage of Mexican-Americans with the total work force in that area:

| Date | % Mexican-Americans |
|---|---|
| 12/70 | 1.67% |
| 12/71 | 1.29% |
| 12/72 | 1.22% |
| 12/73 | 1.82% |
| 7/74 | 3.57% |
| 1/75 | 4.52% |
| 6/76 | 4.50% |

According to the appellant's brief, the statistics in the exhibits presented by the plaintiff and those presented by the defendant vary because the information requested by the plaintiff to prepare his statistical analysis pertained to fewer than all of the Mexican-American applicants and jobs. That may account for some of the difficulty in interpreting this statistical information.

17. The complete first part of the notice said:

*ATTENTION: ALL MEXICAN–AMERICANS WHO APPLIED FOR WORK AT GENERAL TELEPHONE CO. IN IRVING, TEXAS IN 1972, 1973, 1974, 1975, and through October 18, 1976*

The following lawsuit is now pending in Judge Sarah T. Hughes' Court in Dallas and your rights may be affected. Judge Hughes has found that General Telephone Company of Irving, Texas, discriminated against Mexican-Americans as a class from 1972 to October 18,

Court indicated that the determination of what set of statistics are relevant can best be decided on a case-by-case basis. 433 U.S. at 311–312. *See Davis v. City of Dallas,* 483 F.Supp. 54, 60 (N.D.Tex.1979). The evaluation of these statistics involves both a complex legal and factual inquiry. *See e. g. Cooper v. University of Texas at Dallas,* 482 F.Supp. 187 (N.D.Tex.1979); *Davis v. City of Dallas,* 483 F.Supp. 54 (N.D.Tex.1979); *EEOC v. Radiator Specialty Co.,* 610 F.2d 178 (4th Cir. 1979). We therefore remand this part of the case to the district court for a more specific evaluation of both the plaintiff's and defendant's statistics with specific findings on the use of hiring data as opposed to applicant-flow data, including the reasons why the trial court concludes that the discrimination lasted past 1974.[18]

V. *Admission of General Services Administration (GSA) Reports*

In this portion of the appeal, we deal with appellant's objection to the admission of two letters from the GSA to the appellant, that were obtained from General through discovery. General complains that the letters were not authenticated, that there was no evidence as to the basis for the letters, and that the GSA is not authorized by law to determine whether an employer has violated Title VII.

The appellee claims the letters were admissible under Fed.R.Evid. 803(8) which provides in part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .

(8) Public records and reports. Records, reports, statements, or data compilations, in any form of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by

law as to which matters there was a duty to report, . . . or (C) in civil actions and proceedings . . ., factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

■ As to the authenticity point, it is clear that the letters should have been authenticated under Fed.R.Evid. 901 and 902 which require authentication or identification as a condition precedent to admissibility, except in specific situations, none of which is present here. *See* Rule 902. However, the defendant did not object at trial that these documents were not authenticated, but objected only on the grounds that the letters were hearsay and not relevant. This Court has held for some time that "[e]xcept in unusual circumstances, the ground of objection to evidence must be specifically stated in order to preserve the point for appeal; . . ." *Carona v. Pioneer Life Insurance Company,* 357 F.2d 477, 480 (5th Cir. 1966); *Colonial Refrigerated Transportation, Inc. v. Mitchell,* 403 F.2d 541, 552 (5th Cir. 1968); *Morrow v. Greyhound Lines, Inc.,* 541 F.2d 713 (8th Cir. 1976); *see also* F.R.C.P. Rule 46; Rule 103(a)(1), Federal Rules of Evidence. Since General did not make this specific objection, it cannot raise the authentication issue on appeal.

■ Turning then to General's arguments concerning relevancy and hearsay, under Fed.R.Evid. 803(8) the letters are admissible if they are made pursuant to duties derived from authority granted by law. The letters were prepared by the General Services Administration, according to the appellant, as part of its contract compliance review.[19] While this authorization to inves-

---

1976 and you may be entitled to back wages or other relief under certain conditions.

18. Such an evaluation of the statistical evidence, in the light of *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) and subsequent cases will be especially helpful because *Hazelwood* was

decided after this part of the trial was completed.

19. Although it is not part of the record, we assume that this contract compliance review was part of GSA's former responsibility to monitor nondiscrimination in employment by government contractors and subcontractors.

tigate obviously does not parallel the EEOC's authority under Title VII, the letters were admissible under Rule 803(8)(c) since the findings resulted from an investigation made pursuant to authority granted by law. It was certainly within the court's discretion to find that the letters were not untrustworthy. *See* Weinstein and Berger, Weinstein's Evidence § 803(8)[03] at 200–208 (1979).[20]

VI. *The Application Procedure and the Finding that Openings Existed for Which the Class Members were Qualified*

In this portion of the appeal, the appellant urges that the trial judge improperly failed to require the class members to bear the burden of proving that they were qualified for an available opening. As a second point, General argues that the trial court improperly found that General's employment policy exacerbated the discrimination.

As noted earlier, we have already decided to remand the issue of the class action

hiring claims to the district court for further findings of fact. Without those further findings of fact, it is impossible for us to rule on these issues. Any questions surrounding the application procedures and policy will have to wait for answers until the trial court has indicated more clearly why it found discrimination and why it defined the class in the way it did.

VII. *Back-Pay Awards*

This issue concerns the sufficiency of evidence with respect to the specific back pay awards. Again, because of our previous decision to remand the hiring claims, we cannot review this part of the trial court's decision as to that portion of the class. However, we can review the claims as they pertain to Falcon, since we have upheld his request for relief.[21]

The appellees also appeal from the trial court's decision on this issue. Again, we will only review those specific complaints that pertain to Falcon.[22]

---

*See* Executive Order 11246, 30 F.R. 12319 (Sept. 24, 1965), as amended by Ex.Ord. No. 11375, 32 F.R. 14303 (Oct. 13, 1967); Ex.Ord. No. 11478, 34 F.R. 12985 (Aug. 8, 1969); Ex. Ord. No. 12086, 43 F.R. 46501 (Oct. 5, 1978). It is our understanding that subsequent to this action, this responsibility was transferred to the Department of Labor. *See* Executive Order No. 12086, 43 F.R. 46501 (Oct. 5, 1978). *Cf. St. Regis Paper Co. v. Marshall*, 591 F.2d 612 (10th Cir.), *cert. denied*, 444 U.S. 828, 100 S.Ct. 55, 62 L.Ed.2d 36 (1979).

**20.** In *Smith v. Universal Services, Inc.*, 454 F.2d 154, 157–58 (5th Cir. 1972), this Court ruled that an EEOC report in a Title VII case was admissible under the Federal Business Records Act, 28 U.S.C. § 1732, since it was prepared in the regular course of the Commission's business and in accordance with express statutory authority. That case was decided before the promulgation of the Federal Rules of Evidence. In *United States v. American Cynamid [Cyanamid] Co.*, 427 F.Supp. 859, 867 (S.D.N.Y.1977), a case decided after the Rules took effect, that Court held that the business records exception of F.R.Evid. 803(6) which is very similar to 28 U.S.C. § 1732 (*see* Weinstein and Berger, Weinstein's Evidence § 803(6)[02] at 148–151) was not applicable to government records and reports. *But see United States v. Orozco*, 590 F.2d 789, 793 (9th Cir.), *cert. denied* 442 U.S. 920 [99 S.Ct. 2845, 61 L.Ed.2d 288] (1979) (Treasury Enforcement Communi-

cations System (TECS) cards admissible under § 803(8)). The court says "governmental functions could be included within the broad definition of 'business' in Rule 803(6)"). We do not address this question of the relationship between Rules 803(6) and 803(8) since we have already decided that these letters are admissible under Rule 803(8), but we certainly do not rule out the possibility that they might also be admissible under the "business records" exceptions as well.

**21.** Specifically, General argued as to the whole class that there was:
(a) no proof of job availability;
(b) insufficient evidence to support the job security award of $300 because the class members would have been in a union if they had been hired;
(c) insufficient evidence to show what salaries these employes would have earned at General, and
(d) insufficient consideration of evidence indicating that certain employees either chose not to work or were not capable of working.
 As to Falcon, the only consideration that would seem to be applicable would be (c).

**22.** The appellees argued that the trial court:
(a) undervalued the job security award;
(b) failed to award shift differential pay and increases based on promotion;

The appellant claims that there was insufficient evidence to show what salaries the employees would have earned at General. *See* note 21. It is unclear how much of this claim is directed at the award to Falcon. In its Phase II opinion, the trial court calculated Falcon's earnings on the assumption that he would have been promoted to Field Inspector in 1972. *See* Part III.[23] We think there was clearly enough evidence of what Falcon would have earned to support the trial court's findings.

As to those contentions of the plaintiffs which are relevant only to Falcon, the trial court found that damages should be granted only up to the end of the "Phase I" trial, since it found that the defendant, by that date, had remedied the discriminatory practices which gave rise to the litigation. As to Falcon, we do not find that decision to be clearly erroneous, intimating no judgment on the other class claims. In such matters, the trial court has broad discretion. *Cf. Fitzgerald v. Sirloin Stockade, Inc.*, 22 EPD ¶ 30,724 (10th Cir. 1980).

### VIII. *Attorneys' Fees*

Since a portion of this suit is being remanded, we do not review the attorneys' fee claim at this time.

We therefore remand this case to the district court for proceedings not inconsistent with this opinion.

AFFIRMED IN PART AND REMANDED IN PART.

(c) failed to make awards for the period between the Phase I and Phase II trial. (The court had ordered specific injunctive relief in an attempt to end all discrimination at the end of Phase I);

(d) failed to award "front pay," or to retain jurisdiction in order to make periodically further back pay awards.

As to Falcon, the considerations that would seem to be applicable would be (c) and (d).

23. The trial court took into account the fact that Falcon refused a promotion to Installer Repairman in 1970 and that in 1972, he voluntarily stepped down from lineman-in-charge to lineman. The trial court totalled his potential earnings from 10–8–72 to 10–20–76 as $47,336.72. It totalled his actual earnings if he had accepted a position as an installer repairman, when offered, as $46,296.49. It therefore awarded him damages of $1,040.33. Because of a mistake in calculations, Falcon actually should have been awarded a dime less.