**Mariano S. FALCON, Plaintiff,**

v.

**GENERAL TELEPHONE COMPANY OF the SOUTHWEST, Defendant.**

**No. CA 3–75–0403–R.**

United States District Court,
N.D. Texas,
Dallas Division.

June 17, 1985.

Frank Hernandez, John E. Collins, Dallas, Tex., for plaintiff.

E. Russell Nunally, Dallas, Tex., Preston, Holt, Goodrum & Harper, San Angelo, Tex., for defendant.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

The history of this landmark case—which, as the Fifth Circuit has noted, "significantly altered the pertinent law of this Circuit" concerning class certifications in employment discrimination cases [1]—is con-

tained in the following decisions: *General Telephone Co. v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) and 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981), both reversing *portions* of the Fifth Circuit's opinion in *Falcon v. General Telephone Co.,* 626 F.2d 369 (5th Cir.1980), which in turn reversed *parts* of the decision by the Honorable Sarah T. Hughes, *Falcon v. General Telephone Co.,* 463 F.Supp. 315 (D.C.N.D.Tex.1978).

The purpose of this opinion is to comply with the respective remands by the Supreme Court [2] and the Fifth Circuit,[3] and to determine what issues (if any) remain for trial in this case. Specifically, the opinion holds that:

(i) The individual plaintiff, Falcon—who claims he was denied promotion by the defendant, General Telephone, because of his race (Mexican-American)—may not maintain a class action on behalf of Mexican-American applicants who were not hired by General Telephone.[4]

(ii) One of the 13 persons who filed claims in response to the class notice (463 F.Supp. at 317–21) would be permitted to intervene in this case to represent a class of Mexican-American applicants not hired by General Telephone.[4]

(iii) However, "a more specific evaluation of both the plaintiff's and the defendant's" statistical evidence (626 F.2d at 382) establishes that the class claims are baseless and that General Telephone *did not* discriminate against Mexican-American applicants with respect to hiring.[4]

---

1. *Vuyanich v. Republic National Bank of Dallas,* 723 F.2d 1195, 1197 (5th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984).

2. 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (the class certification remand); 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981) (the *Burdine* remand). *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

3. 626 F.2d 369 (5th Cir.1980); 647 F.2d 633 (5th Cir.1981) (the *Burdine* remand); 686 F.2d 261 (5th Cir.1982) (the class certification remand). The last order of remand concluded: "We rein-

state such parts of our original opinion in *Falcon* ... as are not affected by these two decisions of the Supreme Court." This means that the following portions of the Fifth Circuit decision, 626 F.2d 369, are still in effect: "II. Jurisdiction to Hear the Claim" (626 F.2d at 376–77); "IV. Hiring Claims" (626 F.2d at 380–82); "V. Admission of General Services Administration (GSA) Reports" (626 F.2d at 382–83); and "VI. The Application Procedure ..." (626 F.2d at 383). *See* 647 F.2d 633; 686 F.2d 261.

4. This opinion also holds, for reasons discussed below, that no hearing or trial is necessary for this Court to make the decisions summarized in paragraphs (i)–(iii).

1. PROCEDURAL BACKGROUND

(iv) Falcon's claims that he was subjected to race discrimination with respect to promotions cannot be resolved without a new trial.

(v) However, the maximum damages that Falcon can recover in a new trial are limited to the $1,040.33 awarded by Judge Hughes (463 F.Supp. at 321) and affirmed by the Fifth Circuit (626 F.2d at 383–84).

(vi) In addition, both of the remaining charges of discrimination—the class claims regarding hiring and Falcon's individual claim concerning promotion—should be dismissed unless Falcon or the class pays General Telephone the $7,373.27 in costs of appeal, as ordered by the Supreme Court (457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740).

(vii) And, if the costs assessed on appeal are paid, then the only issues remaining for trial will be Falcon's claims of promotion discrimination (liability only), and the amount of attorneys fees to which he may be entitled if he prevails on these claims.

These rulings, of course, change a landmark case into a simple one involving an individual claim of racial discrimination—and they reduce a total judgment of $67,-925.49 (457 U.S. at 153, 102 S.Ct. at 2368) to a maximum recovery of $1,040.33 (plus attorneys fees), an amount exceeded by the costs on appeal ($7,373.27), which are owed by the plaintiff to the defendant, General Telephone. Because of this result—which may well assure still another appeal in this ten-year old case—and because of the remands by the Supreme Court and the Fifth Circuit, the reasons for these decisions will be discussed in detail.

1. PROCEDURAL BACKGROUND

The plaintiff, Mariano S. Falcon, a Mexican-American, filed this class action challenging the hiring and promotion practices of the defendant, General Telephone Company of the Southwest. The Honorable Sarah T. Hughes certified a class action without holding an evidentiary hearing; and, after a "Phase I" liability trial on October 20, 1976, she found that:

"Falcon was not discriminated against in hiring, but in promotions the defendant General Telephone discriminated [against him.] As to the class, however, General Telephone discriminated in hiring but not as to promotion." (463 F.Supp. at 316.)

Then, following a "Phase II" damage trial, Judge Hughes awarded (i) $1,040.33 in damages to Falcon,[5] (ii) $40,057.66 in damages to the 13 class members who filed claims in response to the class notice, and (iii) $28,827.00 to Falcon and the class as attorneys fees. She specifically found that damages should not be awarded after October 20, 1976, the date of the "Phase I" liability trial, because General Telephone "by this date, had remedied the discriminatory practices which gave rise to the instant litigation." (463 F.Supp. at 317.)

There was no appeal from the decisions by Judge Hughes that "Falcon was not discriminated against in hiring" and that the class was not discriminated against "as to promotion." (463 F.Supp. at 316.) As to her other findings, the net result of the Supreme Court and Fifth Circuit opinions is this:

(i) the "across-the-board" class certification was affirmed by the Fifth Circuit (626 F.2d at 374–76), but was reversed and remanded by the Supreme Court for a "rigorous analysis" of the "prerequisites of Rule 23(a)" by the trial court. (457 U.S. at 155–61, 102 S.Ct. at 2369–72.)[6]

(ii) The decisions that "Falcon was discriminated against ... in promotions" was affirmed by the Fifth Circuit (626

---

5. As noted by the Fifth Circuit, "Falcon actually should have been awarded a dime less" because of a mistake in calculations. (626 F.2d at 384, footnote 23.) However, this opinion will use the $1,040.33 figure because the other *Falcon* decisions do so.

6. Chief Justice Burger dissented in part; he would have reversed and remanded "with instructions to dismiss the class claims." (457 U.S. at 161–63, 102 S.Ct. at 2372–73.)

F.2d at 377–80), but was reversed and remanded by the Supreme Court for "further consideration" in light of *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

(iii) The decision that General Telephone had discriminated "as to the class ... in hiring" was reversed and remanded for a more specific evaluation of both the plaintiff's and defendant's statistics (626 F.2d at 380–82), and this issue was not involved in either of the *Falcon* appeals to the Supreme Court.

By the time the mandates had been returned to the Northern District of Texas, Judge Hughes was not in physical condition to deal with this matter. Accordingly, the case was assigned to this Court by random draw.

## 2. ISSUES RESOLVED:

### CLASS PROMOTION CLAIMS, FALCON HIRING CLAIM

Before the remanded questions are addressed, this Court should identify the issues that have been resolved by the prior litigation in this case—because portions of Judge Hughes' decision (463 F.Supp. 315) and the Fifth Circuit opinion (626 F.2d 369) remain in effect. (See footnote 3.) Specifically, no issues remain concerning the class claims that General Telephone discriminated against its Mexican-American employees with respect to promotions, or the individual claim that Falcon was "discriminated against in hiring."

Judge Hughes found that there was no such discrimination in either instance. (463 F.Supp. at 316.) *These rulings were not appealed.* (626 F.2d at 373–74.) Therefore, both Falcon and the class are precluded from raising these issues again by the doctrines of *res judicata*[7] and the law of the case.[8] *See* 457 U.S. at 155, 102 S.Ct. at 2369.

### 3. FALCON AS CLASS REPRESENTATIVE

The first remanded issue is whether Falcon—a current employee who complains that he was denied promotion by General Telephone because of his race—can represent a class of Mexican-Americans who applied for employment during the period in question,[9] but who were not hired.

This issue *was not* remanded either for a new trial or for a new class certification hearing. Instead, the Supreme Court remanded for a "rigorous analysis" by the district court to determine whether "the prerequisites of Rule 23(a) have been satisfied." (457 U.S. at 161, 102 S.Ct. at 2372.) Accordingly, this Court's analysis is based upon the pleadings, the evidence heard by Judge Hughes at the liability and damage trials, and the post-remand motions and briefs filed by the parties.[10]

7. *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); 1B *Moore's Federal Practice* ¶ 0.405[2] at 515, 0.416[5] at 536 (1983).

8. *Conway v. Chemical Leaman Tank Lines, Inc.,* 644 F.2d 1059, 1061 (5th Cir.1981); *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 663 (5th Cir.1974); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 19 (5th Cir.1974); 1B *Moore's Federal Practice* ¶ 0.404[1] at 117.

9. Falcon filed his charge with the EEOC on October 17, 1972, so the class period in question begins 180 days prior to that date. The EEOC's finding and determination was issued January 29, 1974. Falcon received a "right to sue" letter dated January 21, 1975 and filed this action on April 13, 1975. Judge Hughes found that by October 20, 1976, the date of the "Phase I" liability trial, General Telephone "had remedied

the discriminatory practices which gave rise to the instant litigation." (463 F.Supp. at 317.)

10. Judge Hughes initially certified the class in *Falcon* without holding an evidentiary hearing. This practice was affirmed by the Fifth Circuit (626 F.2d at 374) and by the Supreme Court (457 U.S. at 160, 102 S.Ct. at 2372). The Supreme Court's opinion in *Falcon* states:
 "... Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question...." (457 U.S. at 160, 102 S.Ct. at 2372.)
 Both courts concluded that, in this case, the parties had "an adequate opportunity later [after the initial certification] to argue the substan-

And, from this "rigorous analysis," it is clear that Falcon—whose sole claim is that he was denied promotion because of his race—cannot represent a class of Mexican-American applicants who charge General Telephone with hiring discrimination. This is demonstrated by the *Falcon* opinion itself; by the Fifth Circuit's application of *Falcon* in *Vuyanich v. Republic National Bank of Dallas,* 723 F.2d 1195 (5th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984); by other post-*Falcon* opinions; and by the application of the principles of these decisions to the instant case.

### a. *The Falcon Decision*

■ In making an "across-the-board" certification, Judge Hughes relied upon Fifth Circuit cases which permitted broad class attacks upon *all* unequal employment practices alleged to have been committed by an employer pursuant to a policy of racial discrimination.[11] However, in *Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740, the Supreme Court rejected this practice, holding that such across-the-board certifications are appropriate only in *limited* instances:

"... If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential company-wide class action. We find nothing in the statute to indicate that Congress intended to authorize such a wholesale expansion of class-action litigation." (147 U.S. at 159, 102 S.Ct. at 2371.)

In making this "significant alteration" of the law of this Circuit, the Supreme Court discussed *three factors* which trial courts must consider in resolving class certification issues in discrimination matters:

(i) the rule that the requirements of Rule 23(a) effectively "limit the class claims to those fairly encompassed by the named plaintiff's claims." *General*

Telephone *Co. v. EEOC,* 446 U.S. 318 [100 S.Ct. 1698, 64 L.Ed.2d 319] (1980).

(ii) The rule that a class representative must "possess the same interest and suffer the same injury" as the class members. *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403 [97 S.Ct. 1891, 1896, 52 L.Ed.2d 453] (1977); *Schlesinger v. Reservists Committee to Stop The War,* 418 U.S. 208, 216 [94 S.Ct. 2925, 2929, 41 L.Ed.2d 706] (1974).

(iii) The problems of "efficiency and economy" under Rule 23 if there are to be entirely different "evidentiary approaches to the individual and class claims"—i.e., if the named plaintiff intends to prove the individual claim by evidence of intentional discrimination (disparate treatment), but intends to prove the class claims through statistical evidence of disparate impact. *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 553 [94 S.Ct. 756, 766, 38 L.Ed.2d 713] (1974).

With respect to the first two factors, Falcon contended that the class claims of hiring discrimination were "fairly encompassed" in his claims of promotion discrimination, and that all Mexican-American applicants and employees "possessed the same interests and suffered the same injuries" because of the alleged racial discrimination by General Telephone. The Supreme Court definitively rejected this argument:

"... The allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified. Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a

---

tive merits of the decision to certify." (626 F.2d at 374.) This Court's review of the record shows that this was correct.

**11.** *See,* e.g., *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir.1969); *Payne*

*v. Travenol Laboratories,* 565 F.2d 895 (5th Cir. 1978), *cert. denied,* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978).

policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For respondent to bridge that gap, he must prove ... (1) that this discriminatory treatment is typical of [the employer's] promotion practices, (2) that [the employer's] promotion practices are motivated by a policy of ethnic discrimination that pervades [its] Irving division, or (3) that this policy of ethnic discrimination is reflected in [the employer's] other employment practices, such as hiring, in the same way it is manifested in the promotion practices...." (457 U.S. at 157–58, 102 S.Ct. at 2370–71.)

And, with respect to the third factor—that class certification may not be proper if there will be entirely different "evidentiary approaches to the individual and class claims"—the *Falcon* opinion states:

"The trial of this class action followed a predictable course. Instead of raising common questions of law or fact, respondent's evidentiary approaches to the individual and class claims were entirely different. He attempted to sustain his individual claim [of promotion bias] by proving intentional discrimination. He tried to prove the class claims [of hiring discrimination] through statistical evidence of disparate impact. As the District Court's bifurcated findings on liability demonstrate, the individual and class claims might as well have been tried separately. *It is clear that the maintenance of respondent's action as a class action did not advance 'the efficiency and economy of litigation' which is a principal purpose of the procedure.'*" (457 U.S. at 159, 102 S.Ct. at 2371) (emphasis added).[12]

Accordingly, the Supreme Court remanded *Falcon* for the trial court to determine "after a rigorous analysis, [whether] the prerequisites of Rule 23(a) have been satisfied." (457 U.S. at 161, 102 S.Ct. at 2372.) Chief Justice Burger dissented from the remand, stating:

"The record in this case clearly shows that there are no common questions of law or fact between respondent's claim and the class claim; *the only commonality is that respondent is a Mexican-American and he seeks to represent a class of Mexican-Americans....* Like so many Title VII cases, this case has already gone on for years, draining judicial resources as well as resources of the litigants. Rather than promoting judicial economy, the 'across-the-board' class action has promoted multiplication of claims and endless litigation. Since it is clear that the class claim brought on behalf of unsuccessful applicants for jobs with petitioner cannot succeed, I would simply reverse and remand with instructions to dismiss the class claim." (457 U.S. at 162–63, 102 S.Ct. at 2373) (emphasis added).

b.  *The Vuyanich Decision*

In *Vuyanich v. Republic National Bank of Dallas,* 723 F.2d 1195 (5th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 567, 83 L.Ed.2d 507 (1984), the Fifth Circuit *strictly* applied the *Falcon* decision—and discussed a fourth factor which trial courts must consider in class certification matters: the issue of "the named plaintiff's *standing*" to assert the class claims, under *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1983).

Unlike *Falcon,* the district judge in *Vuyanich* (now Fifth Circuit Judge Patrick E. Higginbotham) had held extensive class certification hearings, as well as a liability trial which lasted twenty-four days. (723 F.2d at 1198.) Accordingly, the *Vuyanich* decision demonstrates just how strongly the Fifth Circuit feels that the "pertinent law of this Circuit" has been "significantly

---

12.  In *Wheeler v. City of Columbus,* 703 F.2d 853 (5th Cir.1983), the Fifth Circuit—quoting this language from *Falcon*—held that class certification was not proper because different evidentiary approaches were used to prove the individual and class claims.

altered"—and just how dramatically class certifications in discrimination cases are to be restricted.

Joan Vuyanich, a black, was hired by the Republic National Bank as a clerk (a job "not exempt" from the Fair Labor Standards Act), but was subsequently fired—allegedly because she had a white husband. Ellen Johnson, a black, applied to the Bank for "a position as management trainee or in personnel administration" ("exempt positions" under the FLSA), but was not hired. Without even discussing the evidence heard by the District Judge at the two class certification hearings—and, apparently, considering only the pleadings and the EEOC charges filed by the two individuals—the Fifth Circuit held that, under *Falcon*, (i) Vuyanich could not be certified as a class representative for anyone other than discharged black employees in non-exempt jobs; and (ii) Johnson could not be certified as a class representative for anyone other than females who applied for "exempt positions," but were not hired. The opinion states:

> "In the present case, Vuyanich and Johnson, who both possessed limited claims, have been permitted to assert class claims that are neither common nor typical of their personal claims. *Vuyanich's claims should have been limited to race discrimination in her termination as a non-exempt employee.* Her complaint filed with the EEOC contained only these allegations. Yet her complaint in this action alleged on behalf of herself and other blacks and females presently or previously employed, wide ranging claims of sex and race discrimination in, among other areas, placement, compensation, and promotion. *Johnson's claims should have been limited to sex discrimination in hiring exempt employees.* In her complaint, Johnson alleged sex and race discrimination in hiring. Her class claims, however, alleged only sex discrimination. The district court certified her as a representative of all black and female applicants for both exempt and non-exempt positions and of all black and female exempt employees with promotion, compensation, and transfer claims.

.   .   .   .   .

> "The class action device has proven a useful tool to secure redress of broad based grievances in a just, speedy, and inexpensive manner. *Falcon* teaches, however, its efficiency has limits. *In today's case, the device was improperly used to multiply two significant but discrete classes of claims involving hiring and termination into a full-scale attack on every employment practice of a major metropolitan bank.* This extension of the litigation to claims the named plaintiffs could not raise not only violates rudimentary principles of typicality, commonality, and standing but also creates such a legion of claims and defenses that sheer volume tends to obscure the valid rights of the proper classes and such rights as the members of improperly joined classes may be able to assert in another action." (723 F.2d at 1199, 1200–01) (emphasis added).[13]

In addition, the *Vuyanich* opinion discussed the fourth class certification factor—the issue of standing—and concluded that the "pertinent law of this Circuit" had also been changed by *Blum v. Yaretsky:*

> "The district court's across-the-board class certification also implicated the

---

13. In *Vuyanich,* the Fifth Circuit remanded for "reconsideration of the more limited class rights that the plaintiffs could properly assert." It seems obvious, in view of the language quoted above, that the District Court is to determine only whether Vuyanich could maintain a class action for discharged black employees in non-exempt jobs, and whether Johnson can maintain a class action for female applicants for "exempt positions"—and that the Fifth Circuit certainly did not intend a complete reopening or rehearing of class certification issues for a determination of whether this was one of the "limited instances" in which the "across-the-board theory would be appropriate." See *Vuyanich,* 723 F.2d at 1198; *Falcon,* 457 U.S. at 159, 102 S.Ct. at 2371, footnote 15. However, in view of the class certification hearings already held by the trial court, it is not clear why this remand was necessary.

named plaintiff's standing to assert certain claims. Under principles of standing, the named plaintiffs 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' *Warth v. Seldin,* 422 U.S. 490, 502 [95 S.Ct. 2197, 2207, 45 L.Ed.2d 343] (1975). In *Blum v. Yaretsky,* 457 U.S. 991 [102 S.Ct. 2777, 73 L.Ed.2d 534] (1983), *also decided after the district court's final decision [in Vuyanich],* the Supreme Court addressed the relationship between standing and class actions. The Court reasoned:

'It is not enough that the conduct of which the plaintiff complains will injure someone. The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.'

"The named plaintiffs must establish the requisite case or controversy between themselves and the defendants, otherwise 'none may seek relief on behalf of himself or any other member of the class.' *O'Shea v. Littleton,* 414 U.S. 488, 494 [94 S.Ct. 669, 675, 38 L.Ed.2d 674] (1974). *Because Johnson and Vuyanich can allege injuries only as a result of the Bank's hiring and termination practices, respectively, they lack standing to assert class claims arising from the bank's other employment practices*—compensation, promotion, placement, and maternity practices." (723 F.2d at 1200) (emphasis added).[14]

### c. *Exceptional Situations*

There is a fifth *Falcon-Vuyanich* factor which trial courts must consider in class certification issues in discrimination cases: whether the circumstances present one of the exceptional situations in which an "across-the-board" certification is still permissible.

The *Falcon* opinion did not foreclose *all* "across-the-board" certifications in suits alleging discrimination. In the much-cited footnote 15,[15] the Supreme Court recognized only two possible exceptions:

"If petitioner used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant, or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a). Significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decisionmaking processes...." (457 U.S. at 147, 102 S.Ct. at 2364.)

Moreover, subsequent cases have demonstrated that the "exceptional situations" in which an "across-the-board" certification is still proper are limited, indeed. As to the first footnote 15 example ("a biased testing procedure"), the Fifth Circuit noted in *Fleming v. Travenol Laboratories, Inc.,* 707 F.2d 829 (5th Cir.1983), that:

(i) "... if a particular practice, such as a test, is used in more than one phase of employment decisionmaking—hiring, job assignment, promotion, or termination—an across-the-board attack is permissible *so long as the class action is limited to*

**14.** The emphasized sentence, if read literally, would indicate that, in certain cases, it may be proper for a trial court to deny a motion for class certification without holding a hearing. Note, however, that in *Falcon,* the Fifth Circuit did state that a plaintiff might be able to complain that "the district court made a decision to deny certification without a hearing, since it is only in that case that a party can show that there was a substantial issue as to certification and that he was denied an effective opportunity to litigate it." 626 F.2d at 374.

**15.** And, no doubt, much-to-be-cited.

*the tainted practice.* In the circumstances, a class representative injured by a tainted practice in any of the catagories (hiring, job assignment, promotion) should be able to satisfy the commonality and typicality requirements of Rule 23(a) when challenging *that* practice." (707 F.2d at 833, footnote 3) (emphasis added).[16]

Similarly, an attempt to apply the second footnote 15 example ("general policy of discrimination") was rejected by the Fifth Circuit in *Vuyanich.* (723 F.2d 1199–2000). Emphasizing that this exception demanded *significant proof* of a general policy of discrimination, the Fifth Circuit stated:

"Both *Carpenter* and *Byrd* specifically relied on the language from footnote fifteen in *Falcon* to sustain those broad class actions.... [That footnote] observed that if *significant proof* of a general policy of discrimination was present, it would justify an across-the-board class action. *Such proof was not present here.* The district court's finding that the Bank relied on two objective inputs—education and experience—in its necessarily subjective hiring process, 505 F.Supp. at 371–72, precludes reliance on

this 'general policy of discrimination' exception. The district court's class certification must be vacated and remanded for reconsideration of the proper class in light of *Falcon.*" (712 F.2d at 1199–2000) (emphasis added).[17]

Other post-*Falcon* cases which illustrate the limited scope of the "footnote 15" exceptions include holdings:

... that a nurse's aid claiming she was discharged because she was black may not "serve as class representative with respect to hiring, promotion, or any other employment practices excepting discriminatory discharge." *Redditt v. Mississippi Extended Care Centers, Inc.,* 718 F.2d 1381, 1387 (5th Cir.1983).

... that a police dispatcher claiming she was discharged because of her race could not maintain a class action on behalf of "all past, present, and future black employees" of the city to attack alleged discrimination in "recruiting, hiring, promotion, job assignment or compensation." *Everitt v. City of Marshall,* 703 F.2d 207 (5th Cir.1983).

... that a trainee sales representative claiming she was discharged by a securi-

---

**16.** Thus, in two pre-*Vuyanich* decisions, the Fifth Circuit held that hourly employees could represent a class including salaried workers because the "class representatives' claims of channeling into the lower-paying service/maintenance positions involves issues of law or fact common to those of women employees channelled into lower-paying clerical jobs," *Carpenter v. Stephen F. Austin University,* 706 F.2d 608, 617 (5th Cir.1983)—and that a class of both past and present female deputies and applicants was proper because the policy attacked (the assignment of all new female deputies to the jail and a restriction on their transfer to more desirable sections) limited the number of females that could be hired and, therefore, "both applicants and employees were adversely affected by the same practice." *Richardson v. Byrd,* 709 F.2d 1016, 1020 (5th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1973).

**17.** In *Vuyanich,* the Fifth Circuit also discounted the *Carpenter* and *Richardson* opinions (footnote 16) with this discussion:

"Recent cases from this Circuit that are more similar to the instant case include *Fleming v. Travenol Laboratories, Inc.,* 707 F.2d 829 (5th Cir.1983), in which this court affirmed a denial of class certification because

the named plaintiff offered only unsupported allegations of discrimination regarding employment practices that had not adversely affected her. *Id.* at 832–33; *see also Wheeler v. City of Columbus,* 703 F.2d 853, 855 (5th Cir. 1983) ("Discrimination in its broadest sense is the only question alleged that is common to Wheeler and the class she sought to create and represent.") In *Everitt v. City of Marshall,* 703 F.2d 207 (5th Cir.), *cert. denied* [—— U.S. ——] 104 S.Ct. 241 [78 L.Ed.2d 231] (1983), this court concluded that the named plaintiff's discrimination claims lacked a sufficient nexus with those of the proposed class. The named plaintiff, a former city employee, was covered by civil service regulations different from those of the class she sought to represent. Therefore, the prerequisites of commonality and typicality were not satisfied. 703 F.2d at 210. In addition, the named plaintiff alleged injury as a result of a number of employment practices by which she had not been even arguably affected. *Id.* at 211. Thus, she could not represent those who did allegedly suffer injury from these practices. *Id.*" (723 F.2d at 1200, footnote 1).

ties brokerage firm because of her sex cannot represent a class of applicants who never received an offer from the firm. *Murray v. Jones*, CA 83–0549–D (N.D.Tex. May 10, 1984) (opinion by now Fifth Circuit Judge Robert M. Hill).[18]

d. *The Present Case*

■ Application of the five *Falcon-Vuyanich* factors to the present case demonstrates, without question, that Falcon *is not* a proper representative of a class of Mexican-Americans who applied for employment with General Telephone. In particular:

(i) *Class claims not "fairly encompassed."* Falcon claims that, after being employed by General Telephone, he was denied promotion because of his race. However, the class claims involve charges that General Telephone did not hire applicants because they were Mexican-American. Under *Vuyanich* (723 F.2d at 1199), the class claims of hiring discrimination are not "fairly encompassed" by Falcon's claim of promotion discrimination.[19]

(ii) *Not the same interest or injury.* Under *Falcon* and *Vuyanich*, it is clear that Falcon does not "possess the same interests [and did not] suffer the same injuries" as the class. There is, indeed, a "wide gap" between Falcon's claim that he was denied a promotion on discriminatory grounds and the claim that persons other than Falcon were not hired because they were Mexican-American. (457 U.S. at 157–58, 102 S.Ct. at 2370–71.) Certainly, Falcon did not "bridge this gap" because there was no evidence that the alleged discriminatory treatment of Falcon was typical of General Telephone's promotion practices, and that this "policy of ethnic discrimination" pervades General Telephone's plant and is reflected in other employment practices, such as hiring. (457 U.S. at 157–58, 102 S.Ct. at 2370–71.) Indeed, Judge Hughes specifically found that General Telephone did not discriminate against its Mexican-American employees with respect to promotions—and did not discriminate against Falcon with respect to hiring. (463 F.Supp. at 316.)

(iii) *Entirely different evidentiary approaches.* In this case, Falcon attempts to prove his individual claim of promotion discrimination by means of "disparate treatment" evidence. However, he attempts to establish the class claims of hiring discrimination solely through statistical evidence of "disparate impact." Because the evidentiary approaches are entirely different, Falcon's representation of the class will not "advance the efficiency and economy" of this litigation. (457 U.S. at 159, 102 S.Ct. at 2371.) *See Wheeler v. City of Columbus*, 703 F.2d 853 (5th Cir.1983).

(iv) *No standing to assert class claims.* Falcon can allege injury only as the result of his failure to obtain a promotion. Since he was employed, Falcon cannot complain that the hiring practices of General Telephone may have caused injury to someone else. Therefore, Falcon has no standing to assert the class claims of hiring discrimination. *Vuyanich*, 723 F.2d at 1200; *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534.

(v) *No footnote 15 exception.* Falcon does not complain of a particular practice, such as a "biased testing procedure," which affects more than one employment decision. Nor is there any "significant proof" of a general policy of discrimination; indeed, Judge Hughes found that General Telephone did not discriminate against the

---

**18.** Other cases are summarized in footnote 17. *See also Givens v. Wright*, CA 83–0131–H (N.D. Tex. March 23, 1984) (opinion by Hon. Barefoot Sanders).

**19.** As discussed below, the Fifth Circuit did hold in *Falcon* that, for *jurisdictional* purposes, the changes of hiring discrimination were "reasonably related" to the EEOC charge of promotion discrimination filed by Falcon. *See* the discussion at 626 F.2d 376–77, which applies the jurisdictional standard established in *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th cir. 1970). Although this portion of the Fifth Circuit's *Falcon* opinion is still in effect (footnote 3), the question of jurisdiction is distinct from the issue of who can properly serve as representative of a class presenting charges of hiring discrimination.

class with respect to promotions—and that, in fact, General Telephone had remedied "the discriminatory practices which gave rise to the instant litigation" by the date of the "Phase I" liability trial. (463 F.Supp. at 317.) Therefore, this is not one of the "limited situations" in which an "across-the-board" certification is still permissible under *Falcon*, 457 U.S. at 147, 102 S.Ct. at 2364 (*footnote 15*) and *Vuyanich*, 723 F.2d at 1199–1200.

e. *Summary*

This Court's "rigorous analysis"—based upon the teachings of *Falcon*, *Vuyanich* and subsequent cases—shows that Falcon, who alleges promotion discrimination, may not maintain a class action on behalf of Mexican-American applicants who were not hired by General Telephone. In addition, it seems obvious that both the Supreme Court and the Fifth Circuit have concluded that class certifications in discrimination cases are to be *drastically* curtailed. *Vuyanich*, in particular, would indicates:

> ... that a person who complains of racial discrimination in discharge may, at best, maintain a class action under Rule 23 only on behalf of other discharged employees (723 F.2d at 1199–1200);
>
> ... that a person complaining of sex discrimination in hiring for an exempt position may, at best, maintain a class action only on behalf of other female applicants for exempt positions (723 F.2d at 1199–1200);
>
> ... and that a person who complains of a particular discriminatory practice (e.g., discharge) cannot maintain a class action attacking other alleged discriminatory practices (e.g., hiring, job assignment, promotion, pay) without establishing the existence of one of the very exceptional situations in which an "across-the-board" certification is still permissible (723 F.2d at 1199–1200).

**20.** Of course, a hearing would be held to determine if the intervenor satisfied the requirements of Rule 23(a). In this connection, General Telephone argues that (i) "surely class members who did not respond to the initial notice to the class would be barred by laches or limita-

### 4. AN INTERVENOR AS CLASS REPRESENTATIVE

■ In this case, 13 persons filed claims in response to the class notice; they were awarded $40,057.66 in damages by Judge Hughes. (463 F.Supp. at 317–21.) Understandably, the attorneys for Falcon have requested this Court to permit one or more of these persons to intervene to pursue the class hiring claims.

Initially, it would seem proper to permit such intervention.[20] *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970), permits a trial court to take jurisdiction of class claims which are "reasonably related" to the charges made in the EEOC charge filed by the individual plaintiff. Thus, the Fifth Circuit's opinion in *Falcon*, 626 F.2d 369—specifically in section II, a portion of the opinion still in effect (see footnote 3)—clearly holds that Judge Hughes had jurisdiction over the class hiring claims because they are "sufficiently related" to the complaint of promotion discrimination filed with the EEOC by Falcon:

> "We find that the district court had jurisdiction over both the hiring and promotion claims under the *Sanchez* standard. This Court's traditional application of a liberal standard in this area is a reflection of our understanding about the realities of Title VII litigation. Often the complainants are poor and uneducated. They are unfamiliar with legal concepts and often do not comprehend the specific elements of their complaint. But they understand the basic premise of the Act. They feel that they have been discriminated against on the basis of race or some other impermissible factor. To hold these individuals to a high standard of knowledge about the bases of their charge would ill-serve the remedial purpose of Title VII. In this case, it is sufficient that Falcon alleged the type of

tions from intervening at this juncture," and (ii) since only 13 unhired applicants responded to the class notice, the "numerosity requirement" of Rule 23(a)(1) could not be satisfied. Since these contentions were not fully briefed, they will not be decided in this opinion.

discrimination ('national origin'), especially since an investigation of promotional practices almost inevitably leads to a study of hiring practices, and the EEOC did investigate both areas. *EEOC v. Huttig Sash & Door Co.*, 511 F.2d 453 (5th Cir.1975)." [21]

However, the more recent Fifth Circuit decision in *Vuyanich v. Republic Bank of Dallas*, 723 F.2d 1195, makes it clear that it *would not* be proper to permit intervention by one of the applicants who responded to the class notice in this case. The trial judge in *Vuyanich* had created subclasses and "allowed intervention by three female former employees who sought to intervene and assert claims of injury relating to promotion, transfer, compensation, job classification, and job assignments." (723 F.2d at 1201.) In holding that it was error to permit this intervention, *Vuyanich* severely limited the decision in *Sanchez v. Standard Brands:*

"... Since these intervenors [in *Vuyanich*] had not filed timely charges with the EEOC, they were required to 'proceed .. within the periphery of the issues which [the named plaintiffs] could assert.' *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 499 (5th Cir.1968). Thus, intervention cannot bootstrap the court's jurisdiction to encompass claims regarding practices broader than the hiring and termination claims properly assertable by the named plaintiffs [Vuyanich, Johnson].

"The plaintiffs urge that *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970), supports the allowance of the interventions. *Sanchez* says 'the "scope" of the judicial complaint is limited to the "scope" of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.' *Id.* at 466. This reasonable expectation rule requires that the scope of

allegations made in a judicial complaint be 'like or related' to allegations made in the EEOC charge. *See, e.g., Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 928 (11th Cir.1983). *Since Vuyanich and Johnson had standing to assert only sex discrimination in hiring or race discrimination in termination*, *Oatis v. Crown Zellerbach Corp.* is determinative of the impropriety of allowing intervention." (723 F.2d at 1201) (emphasis added).

Obviously, the Fifth Circuit's opinion in *Vuyanich* conflicts with some of its earlier decisions.[22] However, this is understandable: a determination that the "across-the-board" certification was erroneous because the class claims of discrimination were not "fairly encompassed by the named plaintiff's claims" (*Vuyanich*, 723 F.2d at 1198–1200) would have been inconsistent with any holding that, for purposes of intervention, the class claims were "reasonably related" to the EEOC charge filed by the plaintiff. Therefore, in future cases, it would not be appropriate—under the current state of the law in this Circuit—for this Court to permit intervention by one who has not filed timely EEOC charges in order to substitute a "proper" representative in a class action which does not satisfy the *Falcon-Vuyanich* factors discussed above.

Nevertheless, *in this case only*, intervention will be permitted by one or more of the 13 class members who filed claims in response to the class notice. Since the jurisdictional section of the Fifth Circuit's *Falcon* decision remains in effect (see footnote 3)—and since it expressly holds that the class hiring claims are "reasonably related" to Falcon's claim of promotion discrimination in his EEOC charge—this result, and this intervention, is required by the

---

**21.** This section of the *Falcon* opinion also notes that *EEOC v. Huttig Sash & Door Co.*, 511 F.2d 453, "held that a charge of discrimination in termination will support another claim of discrimination in hiring."

**22.** Including the "jurisdictional section" of the *Falcon* opinion which is quoted above. *See also EEOC v. Huttig Sash & Door Co.*, 511 F.2d 453.

doctrines of the law of the case and res judicata.[23]

### 5. THE CLASS CLAIMS OF HIRING DISCRIMINATION

The second remanded issue is whether "there was insufficient evidence to support the trial court's conclusions that General Telephone discriminated against the class members with respect to hiring." (626 F.2d at 380.)

This issue *was not* remanded for a new trial. Instead, the Fifth Circuit directed the trial court to conduct "a more specific evaluation of both the plaintiff's and the defendant's statistics," and

(i) to make "specific findings on the use of hiring data as opposed to applicant-flow data," and

(ii) to state "the reasons why the trial court concludes that the discrimination lasted past 1974." (626 F.2d at 382.)[24]

Accordingly, this Court's "more specific evaluation" is based upon the statistical evidence introduced by the parties—considered in light of the pleadings, the post-remand motions and briefs, and the other evidence heard by Judge Hughes at the "Phase I" liability and the "Phase II" damage trials. From this "more specific" evaluation, it is clear that the class claims of hiring discrimination are without merit.

#### a. *The Applicable Law*

■ A prima facie case of discrimination can be established "by showing great disparities in general population/work force statistics." *Falcon*, 626 F.2d at 380; *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). However, any such "prima facie showing [can] be rebutted with favorable evidence comparing the qualified labor market with the defendant's

hiring policies during the relevant period." *Falcon*, 626 F.2d at 380; *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

Thus, "once the plaintiff has offered some evidence that is probative of disparity that may be statutorily significant, it is then the defendant's burden to come up with more specific statistical evidence to rebut the plaintiff's proof." *Falcon*, 626 F.2d at 381. Of course, the burden that shifts to the defendant is merely one of production of evidence; the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

#### b. *The Evidence*

At the "Phase I" liability trial, Falcon introduced extensive testimonial and documentary evidence concerning his individual claim that General Telephone had discriminated against him with respect to promotions. However, the *only* evidence he introduced concerning the class claims of hiring discrimination consisted of statistical exhibits. (Plaintiff's Exhibits 16–21; Trial Record at 131.) This evidence compared the percentage of Mexican-Americans in the total work force of the surrounding area (5.24%) to the percentage of Mexican-Americans in General Telephone's work force in 1972 (1.22%) and 1973 (.82%).[25] It also showed the number of Mexican-Americans hired by General Telephone in 1972.[26]

The statistics concerning the number of Mexican-Americans hired by General Telephone in 1973 (and subsequent years) were

23. *See* footnotes 7 and 8.

24. The Fifth Circuit noted that "such an evaluation of the statistical evidence, in the light of *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) and subsequent cases will be especially helpful because *Hazelwood* was decided after this part of the trial was completed." (626 F.2d at 382, footnote 18.)

25. The statistics discussed in this opinion concern only the General Telephone division in Irving, Texas. 626 F.2d at 376.

26. General Telephone presented no evidence concerning hires in 1972. 626 F.2d at 376, footnote 16.

conflicting.[27] However, Judge Hughes credited the evidence presented by General Telephone for 1973, and specifically found that:

(i) 5.24% of the Dallas/Fort Worth labor force was Mexican-American (Pl.Exh. 21; 1970 census);[28]

(ii) 1.22% of General Telephone's work force at Irving was Mexican-American in 1972 (Pl.Exh. 16);

(iii) Twenty people were hired in 1972, but none of them were Mexican-Americans (Pl.Exh. 17);

(iv) Only 4% of those hired in 1973 were Mexican-American (Def.Exh. 8)[29]

These are the only four "statistical facts" stated by Judge Hughes in finding that General Telephone discriminated against the class of Mexican-Americans in hiring. (626 F.2d at 380.) None of them concern the years 1974 and 1975. Moreover, Judge Hughes did not ·discuss the additional statistical evidence introduced by the defendant—which showed that, during the period from 1973 through July 1975,[30] General Telephone "hired Mexican-Americans in numbers greater than their percentage of the labor force even though Mexican-Americans applied for jobs with [General Telephone] in numbers smaller than their percentage of the work force." (457 U.S. at 163.) Specifically, this uncontroverted evidence (Def.Exhs. 8–12; Trial Record at 304–14) establishes that:

(i) General Telephone hired 286 persons from 1973 through July 30, 1975. (Def.Exh. 11.) The percentage of the new hires during this period who were Mexican-Americans was: 4% in 1973; 13.2% in 1974; and 18.8% in 1975 (through July 30). (Def.Exh. 8.)

(ii) The number of Mexican-American applicants at General Telephone from 1973 through July 30, 1975 was: 47 in 1973; 53 in 1974; and 29 in 1975 (through July 30). (Def.Exh. 11.) The number of Mexican-Americans hired by General Telephone during this period was: 8 in 1973; 9 in 1974; and 3 in 1975. (Def.Exh. 11.)

(iii) The number of whites who applied and who were hired by General Telephone from 1973 through July 30, 1975 was: 1974: 1,554 applied, 155 hired; 1974: 1,612 applied, 53 hired; and 1975: 579 applied, 4 hired. (Def.Exh. 11.)

(iv) The percentage of Mexican-Americans and whites hired at General Telephone's Irving facility *from the applicant pool* for each group was: 1973: 17% Mexican-American; 10% white; 1974: 17% Mexican-American, 3.3% white; and 1975: 10.3% Mexican-American, 0.7% white. (Def.Exh. 11.)[31]

Judge Hughes also found—in the "Phase II" damage trial—that General Telephone's "method of accepting and acting upon applications for employment"—discarding applications after ninety days and not explaining to each applicant what jobs were available—*"while not in itself discriminatory,* exacerbated the extant discriminatory practices of the defendant." (463 F.Supp. at 317) (emphasis added). However, this Court's review of the record shows that no evidence was introduced to prove that

**27.** It does appear, as the Fifth Circuit suggested, that "the information requested by the plaintiff to perform his statistical analysis pertained to fewer than all of the Mexican-American applicants and jobs," and that this accounts for the conflicts in the statistical evidence presented by the parties.

**28.** The percentage of the available labor market in Irving, Texas that was Mexican-American was 3.6% in 1970. (Def.Exhs. 13, 14.)

**29.** The Falcon evidence would have shown that 6% of those hired by General Telephone in 1973 were Mexican-American (Pl.Exh. 16). It also indicated that 16% of those hired in 1974, and

10% of those hired in 1975, were Mexican-Americans.

**30.** No reliable statistical evidence was presented concerning hires by General Telephone after July 30, 1975. 626 F.2d at 373, footnote 4; 626 F.2d at 381, footnote 16.

**31.** As the result of this "affirmative action" hiring of minorities (Trial Record at 299, 332–33), the percentage of Mexican-Americans in General Telephone's work force rose from 1.22% in 1972 and 1.82% in 1973 to 3.5% (July 1975), then to 4.52% (January 1975), and remained at 4.50% in 1976. (Pl.Exh. 16.)

these practices affected Mexican-Americans differently than they did whites. Moreover, the statistical evidence established that 4.50% of the employees of General Telephone were Mexican-Americans by June of 1976—and Judge Hughes specifically found that, by the date of the "Phase II" damage trial (October 20, 1976), General Telephone "had remedied the discriminatory practices which gave rise to the instant litigation." (463 F.Supp. at 317.)

c. *Conclusions*

■ From the "more specific evaluation" of *all* the statistics, this Court concludes that Falcon's evidence did establish a prima facie case that General Telephone discriminated against Mexican-Americans in hiring—but only with respect to the years 1972 and 1973—and that *Falcon did not make the required showing of discrimination for 1974, 1975 or 1976.*[32] His own statistics, if taken at face value (see footnotes 27, 29), would show:

(i) that no Mexican-Americans were hired by General Telephone in 1972; that 6% of those hired in 1973 were Mexican-American, but the work force at General Telephone was only 1.22% Mexican-American in 1972 and 1.82% in 1973 (while 5.24% of the available labor force was Mexican-American);

(ii) that 16% of the 1974 hires and 10% of the 1975 hires were Mexican-American, and the percentage of Mexican-Americans in the work force at General Telephone increased to 3.57% in 1974 and 4.52% in 1975.

(iii) that Mexican-Americans constituted 7.33% of the persons hired by General Telephone from July 1972 to July 1976, even though they comprised only 5.24% of the local labor force—and that from 1973 to 1976, 18.3% of all Mexican-American applicants were hired, compared to only 5.66% of Caucasian applicants. (626 F.2d at 380, 381, footnote 16.)

Moreover, it is clear that Falcon's statistical approach was flawed. Since it merely utilized hiring data, the statistics of General Telephone—which were based upon applicant flow data—completely rebutted the plaintiff's prima facie showing for 1972 and 1973. *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Pouncy v. Prudential Ins. Co.*, 668 F.2d 795 (5th Cir.1982). Indeed, these uncontradicted statistics establish that there was no discrimination by General Telephone in any of the years in question; in particular:

(i) The percentage of General Telephone's new hires at its Irving facility which were Mexican-Americans was:

| | |
|---|---|
| 1973 | 4.0% |
| 1974 | 13.2% |
| 1975 | 18.8% |

(ii) The percentage of Mexican Americans and whites who were hired from the applicant pool for that group.

| | Whites | Mexican–Americans |
|---|---|---|
| 1973 | 10% | 17% |
| 1974 | 3.3% | 17% |
| 1975 | 0.7% | 10.3% |

Therefore, with reference to the specific findings requested by the Fifth Circuit (626 F.2d at 382), this Court concludes that:

(i) it is improper in this case to rely solely upon statistics based upon hiring data, and to disregard more appropriate statistics which use applicant-flow data;

(ii) it is improper to find, on the basis of partial (and totally rebutted) statistics for 1972 and 1973, that "discrimination lasted past 1974"—or that General Telephone discriminated against Mexican-Americans in hiring during any of the years in question.

Accordingly, the class claims of hiring discrimination are baseless.

## 6. FALCON'S INDIVIDUAL CLAIM

■ The third remanded issue concerns Falcon's individual claim that General Telephone discriminated against him with re-

---

**32.** Of the 13 persons who filed claims in response to the class notice, none made applications for employment in 1972; two applied in 1973; eight applied in 1974; two applied in 1975; and 1 applied in 1976.

spect to promotions. This remand was "for further proceedings not inconsistent" with *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[33]

a. *Liability*

On appeal, the Fifth Circuit concluded that Judge Hughes correctly held that Falcon had established a prima facie case of discrimination because he was qualified for the position he sought (Field Inspector)— and that, applying pre-*Burdine* standards, Judge Hughes was not "clearly erroneous" in concluding that General Telephone failed to prove that "Falcon was less qualified than the others promoted" to this job. (626 F.2d at 377–80.)

However, *Burdine* holds that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." (450 U.S. at 253, 101 S.Ct. at 1093.) Accordingly, the remand requires this Court to determine whether or not Falcon proved his charge of discrimination by a preponderance of the evidence.

This determination cannot be made without a new trial of the *liability* issues. The parties introduced both statistical and testimonial evidence concerning Falcon's individual claim of discrimination. (626 F.2d at 378–79.) Although the statistical evidence could be evaluated without a new trial, this is not true as to the conflicting testimony. *For example,* Falcon and an EEOC investigator testified that Falcon was at least as qualified as the other persons promoted to the Field Inspector position—while the witnesses for General Telephone testified that "they considered Falcon less qualified" than the others promoted. (626 F.2d at 379.)

Therefore, in order for this Court to determine the credibility of the witnesses and the weight that should be given to their testimony—and to apply the *Burdine* standards properly—it would be necessary for

this Court to hold a new trial concerning the liability of General Telephone with respect to Falcon's individual claim of promotion discrimination.

b. *Damages*

There will be no new trial, however, concerning the damages which Falcon can recover if he prevails on the claim of promotion discrimination. In her "Phase II" damage opinion, Judge Hughes calculated Falcon's earnings on the assumption that he would have been promoted to Field Inspector when he applied in 1972. (463 F.Supp. at 321.) The Fifth Circuit specifically affirmed this damage award:

> "The trial court took into account the fact that Falcon refused a promotion to Installer Repairman in 1970 and that in 1972, he voluntarily stepped down from lineman-in-charge to lineman. The trial court totalled his potential earnings from 10–8–72 to 10–20–76 as $47,336.72. It totalled his actual earnings if he had accepted a position as installer repairman, when offered, as $46,296.49. It therefore awarded him damages of $1,040.33. Because of a mistake in calculations, Falcon actually should have been awarded a dime less." (626 F.2d at 384, footnote 23.)

The related finding by Judge Hughes—that damages should be awarded Falcon "only up to the end of the 'Phase I' trial [October 20, 1976] ... because the defendant, by that date, had remedied the discriminatory practices which gave rise to the litigation" —was also affirmed. (626 F.2d at 384.)

Accordingly, if Falcon should prevail on the liability issues in a new trial, the maximum damages that he could recover are limited to $1,040.33, plus interest, costs, and attorneys fees.

### 7. FALCON'S FAILURE TO PAY COSTS OF APPEAL

In the appeal of this case, the Supreme Court—in reversing the "across-the-board"

---

**33.** *See General Telephone Co. v. Falcon,* 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981) and

647 F.2d 633 (5th Cir.1981) (the *Burdine* remands).

class certification—assessed costs of appeal in the amount of $7,373.27 against the plaintiff. (457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740) (1982).[34] Falcon has not paid any of this amount to General Telephone.

■ This court does have the inherent power to stay or dismiss this suit because of Falcon's failure to pay the costs assessed by the Supreme Court. This power has been recognized by various courts, whether the costs involved have been assessed on appeal[35] or incurred in a prior lawsuit between the same parties.[36] However, the exercise of this power—which is intended to prevent vexatious litigation or to assure compliance with court orders—is discretionary with this Court.[37] *Halcopian v. U.S. Dept. of Labor*, 709 F.2d 1295 (9th Cir.1983); *Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc.*, 346 F.2d 1012 (9th Cir.1965).

■ In exercising this discretionary power in the present case, this Court has considered several factors: Falcon did not ask either the Supreme Court or the Fifth Circuit to stay the assessment of costs pending further proceedings in the trial court;[38]

he has not paid any of the costs of appeal; he does not claim that he is indigent and unable to pay the costs; but he does request an opportunity to obtain "a cost bond to secure the payment of the costs in question."

Moreover, the class claims of hiring discrimination are baseless.[39] Although Falcon does have a right to a new trial of his individual claim of promotion discrimination, any recovery by him would be limited to $1,040.33 (plus interest, costs, and attorneys fees)—an amount less than the $7,373.27 which Falcon owes to General Telephone. This is similar to the circumstances in *Gaussen v. United Fruit Co.*, 317 F.Supp. 813 (S.D.N.Y.1970), where the court stated:

"... In this case the costs are the normal costs of a meritorious appeal. As far as appears, plaintiff is not indigent. He does not claim that he cannot pay the costs. He is obligated to pay them. Moreover, there is reason to believe that his claim is lacking in merit. Defendant has been put to considerable expense in

**34.** A copy of the Supreme Court's order assessing costs is attached to General Telephone's Motion to Dismiss for Failure to Pay Costs (January 17, 1984).

**35.** *Sanderson v. Ford Motor Company*, 90 F.R.D. 375 (N.D.Ala.1981) (failure to pay costs of appeal stays retrial, upon remand from Fifth Circuit, and equities compel dismissal); *Gaussen v. United Fruit Co.*, 317 F.Supp. 813 (S.D.N.Y.1970) (the costs of appeal were not paid, so new trial stayed pending payment); *World Athletic Sports Corp. v. Pahlavi*, 267 F.Supp. 160 (S.D.N.Y.1966) (costs of appeal in state court not paid, so trial in new federal case stayed pending payment or dismissal, if costs not paid within 15 days).

**36.** *Hacopian v. U.S. Dept. of Labor*, 709 F.2d 1295 (9th Cir.1983) (inherent power of court to dismiss a case for nonpayment of costs in prior actions); *Weidenfeld v. Pacific Improvement Co.*, 101 F.2d 699 (2nd Cir.1939) (a second suit, for substantially the same relief as first action, stayed pending payment of costs); *Zaegel v. Public Finance Co.*, 79 F.R.D. 58 (E.D.Mo.1978) (voluntary failure to comply with pre-trial order resulted in involuntary dismissal with costs of first suit, and if those costs were not paid, dismissal of a second action based on same facts is appropriate); *Gainey v. Brotherhood of*

*Railway & S.S. Clerks*, 34 F.R.D. 8 (E.D.Pa.1963) (class action stayed pending payment of costs from two previously dismissed suits on the same facts, with the same parties).

**37.** In *Bankers Securities Corp. v. Ritz Carlton R. & H. Co.*, 99 F.2d 51 (3rd Cir.1938), the Third Circuit held that "when an appellate court orders the costs in a former suit paid, the payment is then, it seems to us, *not* a matter within the discretion of the trial court." (99 F.2d at 52.) However, this decision does not appear to have been followed—and it is contrary to cases holding that the power to dismiss or stay for nonpayment of costs on appeal is discretionary with the trial court. *See Hacopian v. U.S. Dept. of Labor*, 709 F.2d 1295.

**38.** *See Sanderson v. Ford Motor Co.*, 90 F.R.D. 375 (N.D.Ala.1981).

**39.** Even if this Court did not dismiss the class claims, it would still require Falcon or the new class representative to post a cost bond to secure the $7,373.27 owed to General Telephone—since these costs are over 10% of the total judgment of $67,925.49 entered by Judge Hughes. (457 U.S. at 153, 102 S.Ct. at 2368.) *See Gaussen v. United Fruit Co.*, 317 F.Supp. 813, 814 (S.D.N.Y.1970).

defending itself against this claim. To try the case again would obviously involve substantial additional expense." (317 F.Supp. at 814.)

Accordingly, this Court concludes that the present case should be dismissed unless Falcon either pays the costs of appeal or posts a bond to secure these costs. See Rule 12.3, Local Rules of the Northern District of Texas.

## 8. CONCLUSIONS

The Supreme Court's landmark decision in this case (*Falcon*), and the Fifth Circuit's decision in *Vuyanich,* did indeed make significant changes in the law of this Circuit concerning class certification in employment discrimination cases. Because of these changes, Falcon—who presses an individual claim of promotion discrimination—may not maintain a class action on behalf of Mexican-Americans who, unlike Falcon, were not hired by General Telephone. Moreover, "a more specific evaluation" of the statistical evidence establishes that the class claims are baseless, and that General Telephone did not discriminate against Mexican-Americans in hiring.

A new trial would be necessary to resolve Falcon's individual claim that he was subjected to racial discrimination with respect to promotions. However, since the maximum amount he could recover— $1,040.33 (plus interest, costs, and attorneys fees)—is exceeded by the $7,373.27 which Falcon now owes to General Telephone as costs of appeal, this case will be dismissed unless Falcon pays these costs or posts bond to secure their payment.

If Falcon does pay the costs or posts the required bond, then the only issues that will be tried by this Court are (i) the liability of General Telephone on Falcon's individual claim of promotion discrimination, and (ii) the amount of attorneys fees to which Falcon will be entitled if he prevails on this individual claim. Judgment will be entered in accordance with this Memorandum Opinion.